**CASE NO. 23-20290**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

BEAU KELLEY; ALVIN PEREZ LOPEZ; ANTHONY MARTIN; AUSTIN
BRASWELL; CARLOS PEREZ, ET AL,

*Plaintiffs-Appellants*

*v.*

ALPINE SITE SERVICES, INCORPORATED,

*Defendant-Appellee*

---

On Appeal from Cause No. 4:19-CV-1152
In the United States District Court for the Southern District of Texas,
Houston Division

---

**APPELLEE'S BRIEF**

---

Levon G. Hovnatanian
Texas Bar No. 10059825
*hovnatanian@mdjwlaw.com*
MARTIN, DISIERE, JEFFERSON
& WISDOM, LLP
808 Travis Street, Suite 1100
Houston, Texas 77002
Telephone: (713) 632-1700
Facsimile: (713) 222-0101

Steven W. Watkins
Colorado Bar No. 51397
*steve@goldenlawyers.com*
BRADLEY DEVITT HASS
& WATKINS, PC
2201 Ford Street
Golden, Colorado 80401
Telephone: (303) 384-9228
Facsimile: (303) 384-9231

**CASE NO. 23-20290**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

BEAU KELLEY; ALVIN PEREZ LOPEZ; ANTHONY MARTIN; AUSTIN
BRASWELL; CARLOS PEREZ, ET AL,

*Plaintiffs-Appellants*

*v.*

ALPINE SITE SERVICES, INCORPORATED,

*Defendant-Appellee*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons
and entities as described in the fourth sentence of Rule 28.2.1 have an interest in
the outcome of this case.  These representations are made in order that the Judges
of this Court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellants**      Beau Kelley
                               Alvin Lopez
                               Anthony Martin
                               Austin Braswell
                               Carlos Perez
                               Daniel Scherr
                               Leo Butler, Jr.
                               Rex Luman
                               John Szatko
                               Leonardo Hernandez, Jr.
                               Michael Russell

Angelo Molina
Anthony Vronko, III
Thomas Hamby
David Jackson
Sean Pohl
Brady Paholek
Abdal Chavez
Christopher Singletary
James Price
Colin Locklier
Justin Edwards
Brandon Holzbach
Ashton McCasland
Ismael Andrade
Rosbel Overa
Arnoldo Rodriguez
Enrique Rodriguez
Daniel Rodriguez
Tommy Barnes

Appellate Counsel

Curt Hesse
Texas Bar No. 24065414
*curt@mooreandassociates.net*
Melissa Moore
Texas Bar No. 24013189
*melissa@mooreandassociates.net*
MOORE & ASSOCIATES
440 Louisiana Street, Suite 1110
Houston, Texas 77002-1055
Telephone:   (713) 222-6775
Facsimile:   (713) 222-6739
*www.mooreandassociates.net*

| Trial Counsel | Curt Hesse |
| --- | --- |
| | Melissa Moore |
| | |
| | Auriana Chantel Siplin |
| | Texas Bar No. 24128840 |
| | Bridget Dale Davidson |
| | Texas Bar No. 24096858 |
| | MOORE & ASSOCIATES |
| | 440 Louisiana Street, Suite 1110 |
| | Houston, Texas 77002-1055 |
| | Telephone:  (713) 222-6775 |
| | Facsimile:  (713) 222-6739 |

| **Defendant-Appellee** | **Alpine Site Services, Incorporated** |
| --- | --- |

| Appellate Counsel | Levon G. Hovnatanian |
| --- | --- |
| | Texas Bar No. 10059825 |
| | *hovnatanian@mdjwlaw.com* |
| | MARTIN, DISIERE, JEFFERSON & WISDOM, LLP |
| | 808 Travis Street, Suite 1100 |
| | Houston, Texas 77002 |
| | Telephone:  (713) 632-1700 |
| | Facsimile:  (713) 222-0101 |
| | |
| | Steven W. Watkins |
| | Colorado Bar No. 51397 |
| | *steve@goldenlawyers.com* |
| | BRADLEY DEVITT HASS & WATKINS, PC |
| | 2201 Ford Street |
| | Golden, Colorado 80401 |
| | Telephone:  (303) 384-9228 |
| | Facsimile:  (303) 384-9231 |

Trial Counsel

Steven W. Watkins

David B. Jordan
Texas Bar No. 24032603
*djordan@littler.com*
LITTLER MENDELSON, P.C.
1301 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:   (713) 951-9400
Facsimile:    (713) 951-9212

Claire B. Deason
Texas Bar No. 24087399
*cdeason@littler.com*
LITTLER MENDELSON, P.C.
80 South 8th Street
1300 IDS Center
Minneapolis, Minnesota 55402
Telephone:   (612) 313-7610
Facsimile:    (763) 647-7964

Nicole S. LeFave
Texas Bar No. 24085432
*nlefave@littler.com*
LITTLER MENDELSON, P.C.
100 Congress Avenue, Suite 1400
Austin, Texas 78701
Telephone:   (512) 982-7250
Facsimile:    (512) 982-7248

*/s/ Levon G. Hovnatanian*
Levon G. Hovnatanian
**Attorney of Record for Appellee**
**Alpine Site Services, Incorporated**

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Alpine respectfully suggests oral argument is unnecessary. As demonstrated below, the appellants' arguments are contradicted by Supreme Court and Fifth Circuit jurisprudence. Oral argument would only rehash dispositive facts that are already clear from the record and long-familiar case law.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ........................................................i

STATEMENT REGARDING ORAL ARGUMENT ...............................................v

TABLE OF CONTENTS.........................................................................................vi

TABLE OF AUTHORITIES ..................................................................................ix

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................................1

STATEMENT OF THE CASE.................................................................................2

I.      INTRODUCTION TO ALPINE ....................................................................2

II.     A BRUSH WITH DEATH .............................................................................3

III.    THE AFTERMATH:  A NEW "SAFETY CULTURE"..............................4

IV.     ALPINE'S THREE DOL AUDITS...............................................................5

V.      THIS CASE ....................................................................................................8

SUMMARY OF THE ARGUMENT .....................................................................9

ARGUMENT ..........................................................................................................10

I.      THE STANDARDS OF REVIEW...............................................................10

        A.      Appeal After A Bench Trial .................................................................10

        B.      Ruling On A Rule 52(b) Motion .........................................................11

II.     THE DISTRICT COURT WAS CORRECT IN ENTERING
        JUDGMENT FOR ALPINE.........................................................................12

        A.      The Motor Carrier Act Exemption ......................................................12

        B.      Alpine Is A Carrier Whose Transportation Of Property By
                Motor Vehicle Is Subject To The Jurisdiction Of The Secretary
                Of Transportation Under Section 204 Of The Motor Carrier
                Act. ........................................................................................................14

                1.      Alpine is a "person." ................................................................14

2.    Alpine transported property by motor vehicle.........................15

3.    The transportation was as provided in 49 U.S.C. § 13501......15

4.    Alpine transported property to further a commercial enterprise..................................................................................18

C.    Alpine Engages In Activities Of A Character Directly Affecting The Safety Of The Operation Of Motor Vehicles In The Transportation On The Public Highways Of Property In Interstate Commerce Within The Meaning Of The Motor Carrier Act. ............................................................................................18

1.    Alpine's transportation of property on the public highways is in interstate commerce within the meaning of the Motor Carrier Act. ..........................................18

2.    Alpine engages in activities that directly affect the safety of the operation of motor vehicles on the public highways in its transportation of property.................................................20

D.    Conclusion Regarding Motor Carrier Act Exemption ......................24

III.    THE CLAIMANTS' ARGUMENTS DO NOT NEGATE THE APPLICABILITY OF THE MOTOR CARRIER ACT EXEMPTION. ......25

A.    The Claimants Exercised Discretion When Loading. ........................25

B.    The Claimants Were Called Upon To Load—And Did Load— Regularly. ..........................................................................................31

1.    The standard ...........................................................................31

2.    The record supports Alpine.....................................................32

3.    The Claimants' cases are far afield.........................................37

C.    The District Court Applied The Correct "Loading" Standard. ..........39

D.    Alpine Has Records Substantiating Its Defense, But Even If It Did Not, The Testimony In The Record Is Sufficient.......................42

E.    Alpine Was Not Required To Establish That The MCA Exemption Applies On A Workweek Basis.......................................45

1.      The "general rule" applies to this issue. ..................................46

2.      Regulatory guidance suggests any rule should be four
         months. ........................................................................................48

IV.    THE DISTRICT COURT DID NOT ERR IN DENYING THE
         CLAIMANTS' RULE 52(B) MOTION TO ADD OR AMEND
         FINDINGS OF FACT. ..................................................................49

CONCLUSION ........................................................................................50

CERTIFICATE OF SERVICE .............................................................52

CERTIFICATE OF COMPLIANCE ....................................................52

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Coil Tubing Servs., L.L.C.*,
   755 F.3d 279 (5th Cir. 2014)..............................................................19

*Amaya v. Noypi Movers, L.L.C.*,
   741 F.App'x 203 (5th Cir. 2018) ...................................... 36, 37, 45, 48

*Barefoot v. Mid-America Dairymen, Inc.*,
   1994 U.S. App. LEXIS 43124 (5th Cir. 1994) ....................................41

*Britt v. Walgreen Co.*,
   2022 U.S. Dist. LEXIS 246158 (W.D. Tex. 2022)..............................11

*Cunningham v. Circle 8 Crane Servs., L.L.C.*,
   64 F.4th 597 (5th Cir. 2023) .................................................. 12, 13, 43

*Encino Motorcars, LLC v. Navarro*,
   138 S. Ct. 1134 (2018) ........................................................................12

*Fontenot v. Mesa Petroleum Co.*,
   791 F.2d 1207 (5th Cir. 1986) ............................................................50

*Franlink Inc. v. Bace Servs.*,
   50 F.4th 432 (5th Cir. 2022) ...............................................................11

*GlobeRanger Corp. v. Software AG United States of Am., Inc.*,
   836 F.3d 477 (5th Cir. 2016)...............................................................41

*Guzman v. Hacienda Records & Recording Studio, Inc.*,
   808 F.3d 1031 (5th Cir. 2015) ...................................................... 10, 11

*Hopkins v. Texas Mast Climbers, L.L.C.*,
   2005 U.S. Dist. LEXIS 38721 (S.D. Tex. 2005) .......................... 37, 38

*Jacobs v. Nat'l Drug Intelligence Ctr.*,
   548 F.3d 375 (5th Cir. 2008)...............................................................41

*L & F Distrib. v. Cruz*,
   941 S.W.2d 274 (Tex. App.—Corpus Christi 1996, writ denied)......43

*Levinson v. Spector Motor Serv.*,
   330 U.S. 649 (1947)............................................................................31

*Mitchell v. Meco Steel Supply Co.*,
    183 F. Supp. 777 (D. Tex. 1956) ...........................................................39

*Moore v. Performance Pressure Pumping Servs., LLC*,
    2017 U.S. Dist. LEXIS 63384 (W.D. Tex. 2017).................................38

*Morris v. McComb*,
    332 U.S. 422 (1947) ............................................................................36

*Olibas v. Barclay*,
    838 F.3d 442 (5th Cir. 2016)......................................................... 44, 45

*Pyramid Motor Freight Corp. v. Ispass*,
    330 U.S. 695 (1947) ..................................................... 31, 32, 38

*Rosales v. Indus. Sales & Servs., LLC*,
    2022 U.S. Dist. LEXIS 179671 (S.D. Tex. 2022) ...................... 47, 48

*Simmons v. Jackson*,
    2019 U.S. Dist. LEXIS 116320 (N.D. Tex. 2019)..............................11

*Songer v. Dillon Res., Inc.*,
    618 F.3d 467 (5th Cir. 2010)................................................. 36, 41, 42

*Wells v. A.D. Transp. Express, Inc.*,
    2016 U.S. Dist. LEXIS 75598 (E.D. Mich. 2016)..............................49

*Wirtz v. Tyler Pipe & Foundry Co.*,
    369 F.2d 927 (5th Cir. 1966)...............................................................32

*Zimmerman v. City of Austin*,
    881 F.3d 378 (5th Cir. 2018)......................................................... 10, 11

**Statutes**

29 C.F.R. § 782.2(a)................................................................................13

29 C.F.R. § 782.2(b)(3)................................................................. 39, 46, 47

29 C.F.R. § 782.5(c)................................................................................25

1 U.S.C. § 1 ............................................................................................15

29 U.S.C. § 213(b)(1)..............................................................................12

49 U.S.C. § 13101 ................................................................................16

49 U.S.C. § 13102(15) .........................................................................14

49 U.S.C. § 13501 ................................................................................16

49 U.S.C. § 13501(1)(A) ......................................................................19

49 U.S.C. § 31502(b) ...........................................................................14

**Other Authorities**

*Application of the Fed. Motor Carrier Safety Regul.*, 46 Fed. Reg. 37902
    (July 23, 1981) ................................................................................49

U.S. Dep't of Labor Op. Letter FLSA2006-3 (Jan. 13, 2006)................49

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    Is Alpine a carrier whose transportation of property by motor vehicle is subject to the jurisdiction of the Secretary of Transportation under section 204 of the Motor Carrier Act?

2.    Does Alpine engage in activities of a character directly affecting the safety of the operation of motor vehicles in the transportation on the public highways of property in interstate commerce within the meaning of the Motor Carrier Act?

3.    Was the district court correct in denying the appellants' rule 52(b) motion to add or amend findings of fact?

## STATEMENT OF THE CASE

## I.     INTRODUCTION TO ALPINE

Alpine Site Services installs engineered screwpiles.  ROA.3570; ROA.3828. Engineered screwpiles are used as foundations; "in lieu of traditional pilings where they drive them in with a pile hammer, [Alpine will] actually weld a flight under the bottom of a pile and screw it in the ground just like a . . . screw into wood." ROA.3828.

Alpine typically installs screwpiles as foundations for commercial buildings as opposed to residences.  ROA.3828-3829.  An Alpine job usually lasts anywhere from a few weeks to several months, but could take as long as a year.  ROA.4474.

Bernard Gochis started Alpine in 1989.  ROA.3829; ROA.3830.  It was originally an excavation company, but around 2004, it shifted to installing screwpiles.  ROA.3829.

Gochis developed patents for the installation equipment, and the company took off.  ROA.3830.  Eventually it branched "into the energy world," which "seemed to be a great fit," as Alpine could then "put [its] foundations underneath gas processing facilities . . . and eliminate concrete."  ROA.3830.

Oil and gas processing has been Alpine's primary market since about 2006. ROA.3831.  It now works "[a]ll over the U.S. . . . Texas, Oklahoma, Louisiana, Ohio, Pennsylvania, New York, Montana, North Dakota, South Dakota.  It's pretty

2

much all over." ROA.3831. Its corporate office is in Westminster, Colorado, and it has yards in Commerce City, Colorado, and Edna, Texas. ROA.3831.

It is in Commerce City and Edna that Alpine manufactures the screwpiles. ROA.3570; ROA.3831; *see* ROA.3892; ROA.3893. It then transports the screwpiles to the aforementioned states using its own fleet of trucks and trailers. ROA.3832.

## II.    A BRUSH WITH DEATH

Years ago, Gochis himself would drive screwpiles to their destinations. ROA.3857-3858; ROA.3859. On one such job, sometime in the early 2000's, he had other people load the trailer for him. ROA.3858; ROA.3867.

Gochis did not watch the screwpiles get loaded, and he had no idea if they were loaded properly. ROA.3868. He did not check the straps that were holding the load in place. ROA.3858. Instead, he merely "assumed" the load was fine; he "saw straps on there; thought everything was good; hopped in the truck, and then went to go deliver these [screwpiles] to the site." ROA.3858.

When Gochis came to a stoplight, he braked. ROA.3858. He immediately heard the straps pop, and then a rolling noise; then the load flew into the back of the cab. ROA.3858. A piece of pipe penetrated the back window and slammed into the dash, missing him by a foot. ROA.3858-3859. He got out of his seat and pressed against the window, hoping to avoid anything else that came through the

3

cab.  ROA.3858.  Nothing else did, but Gochis realized he had "almost died." ROA.3858.  He "saw [his] life flash before [his] eyes."  ROA.3859.

And he knew his inattention to loading was to blame.  ROA.3858.

## III.  THE AFTERMATH:  A NEW "SAFETY CULTURE"

The incident changed Gochis's approach to safety, and particularly to loading.  ROA.3859.  Now Alpine's construction teams—including laborers, welders, and operators—are trained as loaders.  ROA.3898; ROA.3898-3899; ROA.3959-3960; ROA.3960; *see* ROA.3571.

Alpine's training in loading is done on-the-job.  ROA.4003; ROA.4193; ROA.4212; ROA.4212-4213; ROA.4303; ROA.4303-4304; ROA.4333-4334; *see, e.g.,* ROA.4487; ROA.4488-4489; ROA.4492-4493; ROA.4510; ROA.4511; ROA.4512; ROA.4514; ROA.4515; ROA.4515-4516; ROA.4520; ROA.4522; ROA.4524; ROA.4525-4526; ROA.4527; ROA.4581.  Timothy Belcher—who has performed "pretty much all" construction duties for Alpine, including as project manager (ROA.4708; ROA.4762)—testified that a video or handbook would not be the best way to train in loading (ROA.4719).  Instead, "Hands-on is the best way to learn.  A book and -- or manual wouldn't justify what we do."  ROA.4719.  Indeed, if Alpine were to put in writing what it believed was necessary to train its crews on how to load trailers, the content would be the same as what Alpine tells

them in person. ROA.4534. As for load securement training, that is done both in person and online. ROA.3958.

After Alpine's construction team members are trained in loading, they all load. ROA.3899; ROA.4581. Everyone on site is responsible to load the trailers and load them correctly. ROA.3859; ROA.3870; ROA.4316; ROA.4522; ROA.4713; *see* ROA.3960-3961; ROA.4402; ROA.4478; ROA.4482; ROA.4495; ROA.4496; ROA.4553; ROA.4558; ROA.4579; ROA.4726-4727; ROA.4733; ROA.4734; ROA.4735; ROA.4737; ROA.4739; ROA.4755; ROA.4755-4756.

Not only that, but "all eyes check loads. Everybody's responsible for taking a second look at loads going out and to look at anything that can affect the safety." ROA.3869. It is the duty of the Alpine employees on site to be a "second pair of eyes." ROA.3869; ROA.3871. This means, "All sites. Everywhere." ROA.3869; *accord* ROA.3871.

Gochis now views his close call as "an example of how things have changed. That -- that is what has spiraled us into the realization of a -- this will never happen again, nothing remotely like that." ROA.3868. And indeed, since Alpine made the above changes, it never has. ROA.3861.

## IV.  ALPINE'S THREE DOL AUDITS.

In 2009, the United States Department of Labor audited Alpine. ROA.3842; ROA.3844; *see* ROA.5011-5019. The DOL determined that the motor carrier

exemption applied to Alpine, but that Alpine lacked proper documentation to substantiate the exemption regarding a few of its employees. ROA.3572; ROA.3843; ROA.3924. As to them, the DOL required Alpine to pay back wages. ROA.3843; ROA.3924; ROA.3924-3925. The DOL also determined that Alpine "has been tracking the work performed by the field employees for Motor Carrier Act exempt duties and [is] in the process of coming up with a form for that purpose so in the future, they will be able to substantiate the exemption." ROA.3846.

Alpine did exactly that. ROA.3846. In response to the DOL's determination, Alpine, in collaboration with the DOL, created a form (ROA.3572; ROA.3847; ROA.3848; ROA.3925) and began to use it (ROA.3849).

The form, entitled "Employee Work Report," documents Alpine's compliance with the requirements of the MCA exemption with respect to employees holding the positions that the appellants hold. ROA.3572; ROA.3848; ROA.3849; ROA.3925; ROA.5961. The form states it is "to be completed each Friday, relating to that week's work"; requires the employee to state which specific jobs he worked on that week; and requires the employee to list the specific duties he performed that week by checking whichever of 15 boxes, each of which describes a particular duty, apply. ROA.5961. Six of the 15 involve loading or reloading for transportation. ROA.5961.

The form also requires the employee to "certify" that his "responses on this sheet are true and correct to the best of my knowledge." ROA.5961. Alpine still uses a version of the form today. ROA.3849; ROA.3852.

In 2010, the DOL audited Alpine again. ROA.3849; *see* ROA.5020-5026. It found that the Motor Carrier Act applied to Alpine's field employees. ROA.3849. It also found that, in its "previous investigation, overtime violations occurred when laborer/pipe cutters did not drive or load the pipe screws. However, it was found that many of the interviewees lied on their statements taken by the wage and hour division about their duties, and the establishment's attorney provided proof in some instances that the employees did either drive or load in a safety-affecting manner." ROA.3851. It "advised . . . the employer that they should thoroughly explain . . . to the employee why they are exempt from overtime. The employer suggested that they will show the employees the fact sheet and have them sign it, and that they will ensure that they are advised often about the exemption." ROA.3852.[1] Alpine did not owe any back wages. ROA.3573; ROA.3925; ROA.3971.

Also in 2010, Alpine hired Richard Borchers, a retired federal magistrate judge, to confirm that the Motor Carrier Act applied to it. ROA.3852-3853. After reviewing abundant documents and performing independent legal research, Judge

---

[1]    The fact sheet explains the Motor Carrier Act exemption and to whom it applies. ROA.5926; *see* ROA.5024.

Borchers concluded that the motor carrier exemption applied to Alpine. ROA.5962; *see* ROA.3853.

The third and final DOL audit was in 2014.  ROA.3855; *see* ROA.5004-5010.   The DOL confirmed to Alpine that the Motor Carrier Act applied. ROA.3855-3856.   Again, Alpine did not owe any back wages.   ROA.3573; ROA.3855; ROA.3925; ROA.3958; ROA.3971.

One of the purposes of the Employee Work Report is to ensure that Alpine is actually within the motor carrier exemption.  ROA.3921.  "[Alpine has] said that these employees are doing these safety-affecting duties.  This work report helps [Alpine] record those safety-affecting duties."  ROA.3921.

## V.    THIS CASE

Alpine classified the appellants—who were members of Alpine's construction teams, including laborers and welders (hereinafter, "the Claimants")—as exempt from the overtime requirements of the Fair Labor Standards Act under the Motor Carrier Act exemption and paid them straight time for all hours worked over 40 in a workweek.  ROA.3572.   Thereafter, the Claimants sued Alpine for alleged violations of the FLSA (ROA.103-111; ROA.3570) and sought damages for "unpaid overtime work" (ROA.3570).  None of them have reported they did not complete the Employee Work Report accurately regarding what they did on the job.  ROA.3922.

Trial was to the bench.  ROA.3799-3800.  After the proceeding, the district court signed findings of fact and conclusions of law that were favorable to Alpine (ROA.3569-3577), including conclusions that "[t]he MCA exemption applies to Plaintiffs" and "Plaintiffs were properly classified as exempt pursuant to the MCA exemption" (ROA.3576).  The court also signed a final judgment that dismissed the suit with prejudice.  ROA.3578.  The Claimants filed a motion to add or amend findings of fact (ROA.3614-3624), which the court denied (ROA.3704).

## SUMMARY OF THE ARGUMENT

This Court should affirm.  First, Alpine is a carrier whose transportation of property by motor vehicle is subject to the jurisdiction of the Secretary of Transportation under section 204 of the Motor Carrier Act.  Second, Alpine engages in activities of a character directly affecting the safety of the operation of motor vehicles in the transportation on the public highways of property in interstate commerce within the meaning of the Motor Carrier Act.  Finally, the district court was correct in denying the Claimants' rule 52(b) motion to add or amend findings of fact.

# **ARGUMENT**

## I.     **THE STANDARDS OF REVIEW**

### A.     **Appeal After A Bench Trial**

"The standard of review for a bench trial is well established:  findings of fact are reviewed for clear error and legal issues are reviewed de novo." *Zimmerman v. City of Austin*, 881 F.3d 378, 383 (5th Cir. 2018).  "A finding of the trial judge is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id*.  "Accordingly," this Court will "review the trial judge's factual findings with great deference, and cannot reverse them simply because [it] would reach a different conclusion." *Id*.

Applying the clearly-erroneous standard of review after a bench trial "requires even greater deference to the trial court's findings when they are based upon determinations of credibility." *Guzman v. Hacienda Records & Recording Studio, Inc.*, 808 F.3d 1031, 1036 (5th Cir. 2015).  "When a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Id*.

"The trial judge's credibility determinations are due this extra deference because only he can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Guzman*, 808 F.3d at 1036.  Correspondingly, "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Zimmerman*, 881 F.3d at 383.

### B.     Ruling On A Rule 52(b) Motion

"To prevail on a Rule 52(b) motion to amend, the moving party must show that the Court's findings of fact or conclusions of law are not supported by evidence in the record." *Britt v. Walgreen Co.*, 2022 U.S. Dist. LEXIS 246158, at *2 (W.D. Tex. 2022); *Simmons v. Jackson*, 2019 U.S. Dist. LEXIS 116320, at *13 (N.D. Tex. 2019).

"This court reviews a district court's ruling on a Fed. R. Civ. P. 52(b) . . . motion for abuse of discretion as well." *Franlink Inc. v. Bace Servs.*, 50 F.4th 432, 438 (5th Cir. 2022).  "Under this standard, the district court's decision and decision-making process need only be reasonable." *Id*.  "A district court abuses its discretion if it:  (1) relies on clearly erroneous factual findings; (2) relies on erroneous conclusions of law; or (3) misapplies the law to the facts." *Id*.

11

## II.   THE DISTRICT COURT WAS CORRECT IN ENTERING JUDGMENT FOR ALPINE.

### A.   The Motor Carrier Act Exemption

"Generally, the FLSA requires an employer to pay overtime compensation to any employee working more than forty hours in a workweek." *Cunningham v. Circle 8 Crane Servs., L.L.C.*, 64 F.4th 597, 600 (5th Cir. 2023). "The overtime-pay rule is subject to several enumerated exemptions, however." *Id*.

This Court gives a "fair reading" to those exemptions. *Cunningham*, 64 F.4th at 600. The employer bears the burden of proving that a particular exemption applies. *Id*.

The Motor Carrier Act exemption provides that the FLSA's overtime requirement "shall not apply with respect to any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 204 of the Motor Carrier Act, 1935 [49 USCS § 31502][.]" 29 U.S.C. § 213(b)(1). "[T]he FLSA has over two dozen exemptions in § 213(b) alone," and "[t]hose exemptions are as much a part of the FLSA's purpose as the overtime-pay requirement." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018).

The Secretary of Transportation has the power to establish qualifications and maximum hours of service for "employees who are employed by either 'motor carriers' or 'motor private carriers.'" *Cunningham*, 64 F.4th at 600. "Importantly,

though, the Secretary of Transportation need only possess the power to regulate the employees at issue; it need not actually exercise that power for the MCA exemption to apply." *Id*. at 600-601.

The Department of Transportation has "promulgated regulations that interpret the statutory requirements of the MCA exemption." *Cunningham*, 64 F.4th at 601. One such regulation states that the MCA exemption "depends both on the class to which [the] employer belongs and on the class of work involved in the employee's job." 29 C.F.R. § 782.2(a). Specifically, "The power of the Secretary of Transportation to establish maximum hours and qualifications of service of employees, on which exemption depends, extends to those classes of employees and those only who:

> (1) Are employed by carriers whose transportation of passengers or property by motor vehicle is subject to his jurisdiction under section 204 of the Motor Carrier Act . . . and (2) engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act.

*Id*. "In short, for the MCA exemption to apply, the employer must prove that the employee meets both of these requirements." *Cunningham*, 64 F.4th at 601.

**B.      Alpine Is A Carrier Whose Transportation Of Property By Motor Vehicle Is Subject To The Jurisdiction Of The Secretary Of Transportation Under Section 204 Of The Motor Carrier Act.**

The Secretary of Transportation has jurisdiction over "motor private carriers." 49 U.S.C. § 31502(b). A "motor private carrier" is "a person, other than a motor carrier, transporting property by motor vehicle when—

(A)    the transportation is as provided in section 13501 of this title [49 USCS § 13501];

(B)    the person is the owner, lessee, or bailee of the property being transported; and

(C)    the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise."

49 U.S.C. § 13102(15).

The district court concluded that Alpine is a "motor private carrier." ROA.3575. In its Agreed Applicable Propositions of Law, the Claimants and Alpine "agreed to stipulate to the following propositions of law: . . . Defendant is and has been at all relevant times a 'motor private carrier' for purposes of the MCA exemption." ROA.3003. The record amply supports the conclusion and the stipulation.

**1.      Alpine is a "person."**

"In determining the meaning of any Act of Congress, unless the context indicates otherwise— . . . the words 'person' and 'whoever' include corporations, companies, associations, firms, partnerships, societies, and joint stock companies,

14

as well as individuals[.]"  1 U.S.C. § 1.  Alpine is a company.  ROA.3829;

ROA.3829-3830;  ROA.3830;  ROA.3834;  ROA.3841;  ROA.3843;  ROA.4321.

Thus, Alpine is a "person."

### 2.     Alpine transported property by motor vehicle.

After Alpine manufactures the screwpiles in either Commerce City or Edna

(ROA.3831; *see* ROA.3892; ROA.3893), it transports them using its own fleet of

trucks  and  trailers  (ROA.3832).    Alpine  transports  cutoff  the  same  way.

ROA.4320-4321.[2]  Thus, Alpine transports property by motor vehicle.

### 3.     The transportation was as provided in 49 U.S.C. § 13501.

49 U.S.C. § 13501 states:

The Secretary and the Board have jurisdiction, as specified in this part
[49 USCS §§ 13101 et seq.], over transportation by motor carrier and
the procurement of that transportation, to the extent that passengers,
property, or both, are transported by motor carrier—

(1)     between a place in—

(A)     a State and a place in another State;

(B)     a State and another place in the same State through
another State;

(C)     the United States and a place in a territory or possession
of the United States to the extent the transportation is in
the United States;

---

[2]     Cutoff is "leftover pipe that is not being used for the foundation."  ROA.3982.

(D)    the United States and another place in the United States
through a foreign country to the extent the transportation
is in the United States; or

(E)    the United States and a place in a foreign country to the
extent the transportation is in the United States; and

(2)    in a reservation under the exclusive jurisdiction of the United
States or on a public highway.

49 U.S.C. § 13501.

Alpine transported, via trucks, property from state to state.  ROA.3831-
3832; ROA.3870; ROA.3926; ROA.3927; ROA.3928-3930; ROA.3931-3932;
ROA.4187-4188; ROA.4480; *see* ROA.3845.  Indeed, in their Admissions of Fact,
the Claimants and Alpine "stipulate[d]" that "[o]nce manufactured, the screwpiles
. . . are loaded on to 45-foot flat-deck trailers and transported by Defendant to
Defendant's jobsites across the country across state lines."  ROA.3000-3001.
Similarly, in another Admission of Fact, the Claimants and Alpine "stipulate[d]"
that "Defendant transports and installs engineered screwpiles, a foundation pile
system used in construction applications."  ROA.3000-3001.

The Claimants say "Alpine is a construction—not transportation—
company[.]"  Brief of Appellant at 3.  But the MCA exemption does not require
Alpine to be a "transportation company" as opposed to a "construction company."
Instead, it requires interstate "transportation."  49 U.S.C. § 13101.  As shown
above, the Claimants stipulated that Alpine "transport[s]" the screwpiles "to

Defendant's jobsites across the country across state lines" (ROA.3000-3001), and abundant evidence appends that stipulation (ROA.3831-3832; ROA.3870; ROA.3926; ROA.3927; ROA.3928-3930; ROA.3931-3932; ROA.4187-4188; ROA.4480; *see* ROA.3845).

Given the above, the record establishes that Alpine engaged in the interstate transportation of screwpiles and related property. Thus, the district court found:

- Alpine transports and installs engineered screwpiles, a foundation pile system used in construction applications.

- The screwpiles Alpine transports and installs are manufactured in yards located in Commerce City, Colorado, and Edna, Texas. Once manufactured, the screwpiles, along with other construction equipment and materials, are loaded onto 45-foot flat-deck trailers and transported by Alpine to its jobsites across the country.

- Once a screwpile is installed, it is cut off to the proper elevation and a pier cap or cap plate is welded on the top of the screwpile. The excess screwpile, which is called "cutoff," is then loaded and secured by Alpine's employees back onto the flatbed trailers to be transported back to the yards in Colorado or Texas.

- Alpine's employees also load and secure items such as extra cap plates and other tools, equipment, and machinery onto trailers for transport to other jobsites or back to the yards in Colorado or Texas.

- Alpine's employees also load and secure load test equipment onto trailers for transport to other jobsites or back to the yards in Colorado or Texas.

ROA.3570-3571.

### 4. Alpine transported property to further a commercial enterprise.

Alpine manufactured the screwpiles (ROA.3831; ROA.3892; ROA.3893); sold them (mainly to oil and gas processing companies) (ROA.3830-3831); and transported them to, and installed them at, the buyer's site (ROA.3892-3893). Correspondingly, in their Admissions of Fact, the Claimants and Alpine "stipulate[d]" that Alpine "manufactured" the screwpiles in its Colorado and Texas yards; "[o]nce manufactured, the screwpiles . . . are loaded on to 45-foot flat-deck trailers and transported by Defendant to Defendant's jobsites across the country across state lines"; and "Defendant transports and installs engineered screwpiles[.]" ROA.3000-3001.

In sum: Alpine is a carrier whose transportation of property by motor vehicle is subject to the jurisdiction of the Secretary of Transportation under section 204 of the Motor Carrier Act.

### C. Alpine Engages In Activities Of A Character Directly Affecting The Safety Of The Operation Of Motor Vehicles In The Transportation On The Public Highways Of Property In Interstate Commerce Within The Meaning Of The Motor Carrier Act.

### 1. Alpine's transportation of property on the public highways is in interstate commerce within the meaning of the Motor Carrier Act.

To begin with the least involved requirement: "The MCA defines interstate commerce as commerce 'between a place in . . . a State and a place in another

State.'"  *Allen v. Coil Tubing Servs., L.L.C.*, 755 F.3d 279, 283 (5th Cir. 2014) (quoting 49 U.S.C. § 13501(1)(A)).  "However, this definition has not been applied literally by the courts.  In fact, we have defined it as the actual transport of goods across state lines or the intrastate transport of goods in the flow of interstate commerce."  *Allen*, 755 F.3d at 283.

As discussed above, Alpine manufactured the screwpiles (ROA.3831; ROA.3892; ROA.3893); sold them (mainly to oil and gas processing companies) (ROA.3830-3831); and transported them to, and installed them at, the buyer's site (ROA.3892-3893).  And Alpine's transportation was via trucks, from state to state.  ROA.3831-3832;    ROA.3870;    ROA.3926;    ROA.3927;    ROA.3928-3930; ROA.3931-3932; ROA.4187-4188; ROA.4480; *see* ROA.3845.  Indeed, in their Admissions of Fact, the Claimants and Alpine "stipulate[d]" that "[o]nce manufactured, the screwpiles . . . are loaded on to 45-foot flat-deck trailers and transported by Defendant to Defendant's jobsites across the country across state lines."  ROA.3000-3001.

The record establishes that Alpine's transportation on the public highways of property was in interstate commerce within the meaning of the Motor Carrier Act.  Accordingly, the district court found that Alpine's "loaded trailers traveled in interstate commerce on interstate highways."  ROA.3571.

### 2. Alpine engages in activities that directly affect the safety of the operation of motor vehicles on the public highways in its transportation of property.

The district court found Alpine loads screwpiles on 45-foot flat-deck trailers and transports them to jobsites across the country; the excess screwpile, i.e. the "cutoff," is loaded by Alpine's employees onto flatbed trailers to be transported back to Alpine's yards in Colorado or Texas; Alpine's employees load extra cap plates and other tools, equipment, and machinery onto trailers for transport to other jobsites or back to the yards in Colorado or Texas; and Alpine's employees load test equipment onto trailers for transport to other jobsites or back to the yards in Colorado or Texas. ROA.3570-3571.

In its transportation of such material, Alpine engages in activities that directly affect the safety of the operation of motor vehicles on the public highways. In particular, it is crucial for safety's sake that Alpine's construction crews properly load the trailers for their trips. Belcher testified:

> Q. And can you explain to the Court why you believe it's important for these loads to be safe?
>
> A. Yeah. Because, like I said earlier, you can end up killing somebody if a load shifts down the road or if something flies off that trailer.

ROA.4756.

Similarly, Travis Guillory, an Alpine project manager, supervisor, and yard manager (ROA.4471-4472), testified:

20

Q.    And why are you thinking about the balance and the distribution of the weight on the trailer the way that you've described while you're loading?

A.    So that truck driver thinks it's fine and leaves with it. It could be catastrophic if the load falls off or something comes loose and falls out on the road. It's -- some people can die from that.

ROA.4517.

Likewise, Greg Pemberton, an Alpine manager (ROA.4273), testified:

Q.    Let's talk about safety just a little bit more.

       What role does safety play as it relates to loading those trailers?

A.    It's critical. I mean, not only is it the act of actually loading the trailer, but it's the assurance that it'll safely arrive at its destination.

Q.    And when you mean [sic] "safely arrive at its destination," what do you mean?

A.    I mean that everything that was on that trailer arrives without incident.

Q.    What happens if one of those straps loosens in that -- those cutoffs become destabilized on that trailer?

A.    They have the potential to fall off.

Q.    And these trucks are driving down -- are they driving down the public highways?

A.    Yes.

Q.    And if that -- how much does a piece of 15-foot steel pipe weigh?

A.    Hundreds of pounds.

Q.    Is -- do you expect hundreds of pounds of steel pipe to cause damage?

A.    Absolutely.

Q.    If it falls off down the highway?

A.    Yes.

ROA.4320-4321.  Accordingly, Pemberton listed "the safety of the public of going

down the highway" as one of Alpine's safety "ramifications."  ROA.4321.

Such testimony was not confined to Alpine.  Beau Kelley, one of the

Claimants (ROA.103), testified:

Q.    . . . Am I right that for all of us in this room:  Doing something in your job that could cause harm to others is a big deal?

A.    Yes.

Q.    And I'm sure the judge faces those decisions as a -- as a judge presiding over criminal trials.  Other lawyers deal with these issues similarly.

You dealt with them loading those trailers, right?

A.    Yeah.

Q.    And you knew if you didn't go back and double-check that strap; didn't make sure they were the right width; didn't get the right number of straps; didn't get the right height; didn't get the right length; left something loose, you knew that it was a big deal if that load failed.  Somebody could get hurt.  Somebody could die?

A.    Yeah.

Q.    And beyond all the money and beyond all the paperwork and all
      the signing this and signing that, that's a big deal, right?

A.    Correct.

Q.    And -- and you knew that at Alpine?

A.    Yes.

Q.    And you heard Mr. Gochis testify –

MS. MOORE:    I'm going to object.  He's asked the same
              question several times.  We get it that
              there's a danger.  So it's duplicative. . . .

THE COURT:    Okay.  I -- I understand the objection.  I'm
              going to let you continue your cross-
              examination, but I understand.  But you
              haven't -- you're not wasting the Court's
              time.  So I'm going to let you continue.

ROA.4031-4032.

Likewise, Michael Russell, another Claimant (ROA.634), testified:

Q.    . . . Did you know what would happen if that load failed going
      down the highway?  Did you ever think about that?

A.    Common sense that it would fall off.

Q.    It was important --

A.    It was.

Q.    -- you got it tied down?

A.    Right.

Q.     I mean, it could be your family out there; somebody else's family.  It's still a big deal, right?

A.     Right.

ROA.4835.

There is even more such testimony in the record.  *See, e.g.,* ROA.3859-3861;

ROA.3869;    ROA.4007-4009;    ROA.4193;    ROA.4381;    ROA.4406-4407;

ROA.4516; ROA.4575.  As one of the Claimants' attorneys himself put it:  "You

heard previously about the potentially catastrophic consequences of an improperly

loaded vehicle.  That's true."  ROA.3823.

Considering the above, the district court was right to conclude that the

Claimants' "loading duties had a significant effect on the safety of vehicles in

interstate transportation such that improper loading or securing could cause

catastrophic damage to the flatbed trailer, the tractor, the driver, other vehicles on

the road, and the general public."  ROA.3576.

### D.     Conclusion Regarding Motor Carrier Act Exemption

Alpine had the burden of proof on the MCA exemption, and carried it.

Accordingly, the district court concluded, "The MCA exemption applies to

Plaintiffs," and "Plaintiffs were properly classified as exempt pursuant to the MCA

exemption."  ROA.3576.  Those conclusions, and the district court's corresponding

judgment, are correct.

## III.   THE CLAIMANTS' ARGUMENTS DO NOT NEGATE THE APPLICABILITY OF THE MOTOR CARRIER ACT EXEMPTION.

### A.   The Claimants Exercised Discretion When Loading.

The MCA exemption does not apply to an employee who loads "where another employee tells him exactly what to do in each instance and he is given no share in the exercise of discretion as to the manner in which the loading is done." 29 C.F.R. § 782.5(c).   The Claimants suggest they did not exercise discretion. Brief of Appellant at 27.   But numerous witnesses, including some of the Claimants themselves, testified otherwise:

> Q.   [By the Claimants' counsel] . . . Considering how important loading is, we all agree something bad can happen, why don't you test new hires for proficiency in loading?
>
> A.   We train them on how to load.
>
> . . .
>
> Q.   . . . I'm guessing loading is a pretty complicated task?
>
> A.   We train our employees on how to load.  They do have to use their judgment on how to do it.

ROA.3959-3960 (Jamie Hawkins, Alpine's office manager (ROA.3891)).

> A.   I assist with loading the trailers.  I don't dictate how it's done.
>
> Q.   Well, who dictates it?
>
> A.   The guys who do it on a regular basis.
>
> Q.   And who is that?

A.    All the crew members.

ROA.4330 (Pemberton).

Q.    In those crews that are loading the trailer, who's making the -- who has the ability to make loading decisions about how that's put together?

A.    They all do.

Q.    You've observed hundreds of trailers being loaded?

A.    Yes.

Q.    But you're not making loading decisions about how the trailers are being loaded?

A.    Not typically, no.

Q.    You leave that for the crew?

A.    Yes.  They have more experience.

ROA.4307-4308 (Pemberton).

Q.    Did you observe the other crew members on those jobsites doing the same kind of work that you've described in your testimony today, loading?

A.    Yes.

Q.    Did they collaborate and make loading decisions independently and together?

A.    It's been a while, but they would have, yes.

ROA.4579 (Guillory).

Q.    Do you typically try to train your crew members so that they're capable of loading without you giving them instructions on how to do it?

A.    Yes.

Q.    And do you expect crew members to be able to load trailers without you?

A.    Yes.

Q.    Do you check every single trailer that leaves the jobsite before it leaves?

A.    No.

Q.    Why not?

A.    Because I'm a busy person, you know.  I might be leaving that day; I'm not there; so on.  You know, I put trust in my crew.

Q.    So you expect that the crew -- the construction team members are going to check that trailer for you?

A.    Yes.

ROA.4718-4719 (Belcher).

Q.    Is it possible that they can load these trailers and not learn the things that you have described for us?

       Is there someone there telling them what to do every time?

A.    No.  They -- they'll learn it over time.

Q.    And they're trained, right?

A.    Yes.

Q.    Is the expectation that they'll do it independently?

A.     Yes.

Q.     In the yard?

A.     Yes.

Q.     On the jobsite?

A.     Yes.

Q.     On the load test?

A.     Yes.

Q.     And because every trailer is different, every load is different, is the expectation that they'll navigate those differences on their own as they need to?

A.     Yes.

Q.     And collaborate with each other?

A.     Yes.

Q.     Have you done that in your nearly six years of employment with Alpine in every job out in the field?

A.     Yes.

Q.     Do you see others doing that every day?

A.     Yes.

Q.     Did you see that at Battle Horse?

A.     Yes.

Q.     You saw it at Pelican?

A.     Yes.

ROA.4540-4541 (Guillory).

Q.    When these construction team members are loading items onto flatbed trailers and service trucks, what types of decisions are they making about loading and securing these items?

A.    Safety decisions.  Making sure it's loaded safely; stacked tight; strapped down properly.

ROA.4755 (Belcher).

Q.    The last time we spoke, in June of last year, you told me that loading and securing trailers takes independent judgment.  Do you remember talking about that?

A.    Yes.

Q.    Fair to say every load is different?

A.    Yes.

Q.    And you learned to load trailers by watching other people and asking a lot of questions; is that right?

A.    Yes.

Q.    On -- it was on-the-job training?

A.    Yes.

Q.    And is it fair to say that everyone out at the jobsite has their own way of loading and securing?

A.    Yes.

Q.    One way isn't necessarily better than another?

A.    Yes.  Some -- yes.

Q.    As long as the load is safe?

A.    That's the important thing.

ROA.4192-4193 (Claimant Christopher Singletary).

Q.    Okay.  So when you were -- you and the other laborer, for example, were out there figuring out how to do it, you guys had to make your own decisions about how best to load it?

A.    Right.  Till the supervisor came out there and said this is how you do it.

Q.    Until when?

A.    The supervisor came out there and showed us how to do it.

Q.    So you said Matt Snell came around once or twice and showed you how to do it, right?

A.    Yes, sir.

Q.    And other than that, it was left to you guys to figure out how to get that trailer loaded?

A.    Yes, sir.

Q.    And that's what you did?

A.    Yes, sir.

ROA.4843-4844 (Russell).

Q.    Do you recall testifying at your deposition that you used your own independent judgment to strap this load test equipment?

A.    Yes.

ROA.4191 (Singletary).

30

In sum, there is abundant evidence in the record that the Claimants exercised discretion when loading.  Accordingly, the district court was right to conclude that "Plaintiffs did not merely furnish physical assistance to other employees in loading the trailers.  Plaintiffs shared in the exercise of discretion regarding loading the trailers[.]"  ROA.3576.

## B.    The Claimants Were Called Upon To Load—And Did Load—Regularly.

The Claimants suggest they were not "regularly called upon to perform safety-affecting activities" (Brief of Appellant at 17) and did not perform such duties "frequently enough to qualify them for the Motor Carrier Act exemption" (Brief of Appellant at 23).  They are incorrect.

### 1.    The standard

Even "a full-duty 'loader' does not have to devote more than a 'substantial part' of his time to activities directly affecting safety of operation in order to be subject to the power of the Commission to establish qualifications and maximum hours of service with respect to him."  *Levinson v. Spector Motor Serv.*, 330 U.S. 649, 681 (1947).  Only a "substantial part" of the employee's activities must be directed to loading for the MCA exemption to apply; there is no need for proof of "what fraction of his time was spent" thereon.  *Id.*; *see* ROA.3575.

Based on *Pyramid Motor Freight Corp. v. Ispass*, 330 U.S. 695, 708 (1947), this Court has provided "the de minimis rule" that loading which is merely a

"'trivial, casual or occasional part of an employee's activities'" is not qualified "loading." *Wirtz v. Tyler Pipe & Foundry Co.*, 369 F.2d 927, 930 (5th Cir. 1966) (quoting 330 U.S. at 708). As will be shown below, the loading in this case was much more than that.

> ### 2. The record supports Alpine.

In his 10 years as an employee, Pemberton has seen Alpine trailers loaded "hundreds of times." ROA.4292. He testified that "[a]nyone on the team"—including laborers, welders, and operators—loads them, and that no one on a construction crew is excluded from doing so. ROA.4292; *see* ROA.4713 (Belcher testifying that everyone, including supervisors, welders, operators, and laborers, is responsible for loading cutoff). Pemberton also testified that loading is part of the crew's *regular and ordinary duties*:

> Q. Is it one of the *regular duties of your crew* to *load trailers*?
>
> A. *Yes.*
>
> Q. Is it one of the *ordinary duties of the crew members* to *load trailers*?
>
> A. *Yes.*

ROA.4292-4293 (emphasis added).

Guillory testified that, on a jobsite, the crew's duties include loading. ROA.4473-4474. He added that, on a typical jobsite, the crew loads scrap onto

trailers on a weekly basis.  ROA.4496.  Correspondingly, regarding two specific

jobsites, he testified that everyone on the crew loaded weekly.  ROA.4495-4496.

Pemberton testified that Alpine's trailers are loaded once a week to several

times a month:

> Q.   How often do you -- do you believe trailers, based on your
>       hundreds of observations, are being loaded on your projects?
>
> A.   Again, it depends on the jobsite, but anywhere from weekly to a
>       few times a month.

ROA.4293.  He added that no one has ever refused to load a truck or said loading

was not part of his job.  ROA.4315; *see* ROA.4713 (Belcher testifying he could not

recall anyone on his crews refusing to help load a flatbed trailer).

The Claimants' testimony was similar.  Kelley variously testified he loaded

cutoff about once a week (ROA.3983); he loaded trailers in the field probably at

least once a week (ROA.4014); at the Edna yard, he loaded two or three days a

week (ROA.4014); and he loaded plates and piles and other equipment on a semi-

trailer as needed approximately one to two times a week (ROA.4026).[3]

---

[3]   Later, Kelley testified he was talking about how often the crew loaded, not "myself personally."  ROA.4152.  At the request of Alpine's counsel, he then read an interrogatory answer in which he stated he had "loaded and secured plates, piles, and other non-heavy equipment onto semitrailers as needed approximately one to two times a week[.]"  ROA.4153-4154.  Kelley testified he did not know whether the interrogatory answer refreshed his recollection, but he acknowledged the answer was his words.  ROA.4155.

Finally, Kelley testified he would load trailers at the yard two to three times a week. ROA.4156. He agreed that, even when he was not loading, he could have been called upon to load. ROA.4161.

Singeltary testified that at one jobsite, he loaded trailers once a week (ROA.4185-4186), and that he assisted in loading screwpiles, pipes, and plates onto semi-trailers approximately two to three times a week (ROA.4223-4224). Abdal Cejudo Chavez testified he loaded equipment, such as Bobcats and pipes, onto trailers approximately two times a week or as needed. ROA.4383.

Tyler Trupp testified it "sounds about right" that he would load screwpiles onto trailers at Edna usually once or twice a week. ROA.4400. James Price testified he loaded trailers approximately one to two times a week (ROA.4589-4590); he loaded screwpiles onto trailers in the Colorado yard about two to three times a week (ROA.4600); and when he was out at a job site, he helped load screwpiles onto trailers about once or twice a week (ROA.4600).

Carlos Perez testified he loaded screwpiles onto flatbed trailers approximately once a week (ROA.4624) and he loaded trailers on the jobsites about once a week (ROA.4627). Russell testified that, at one jobsite, he loaded scrap and piles on a flatbed trailer approximately two times a week, and that he loaded one to two times a week. ROA.4828-4829. Russell also testified he spends 40 percent of his time loading scrap. ROA.4841-4842.

The Claimants' interrogatory answers also addressed the issue.  Some of them state:

| Claimant | Frequency of Loading |
|---|---|
| Chavez | loaded "approximately 2 times a week or as needed" |
| Thomas Hamby | loaded "as needed" and "strapped and secured straps onto flatbed trailer[s] approximately once a week or as needed" |
| Brandon Holzbach | loaded "approximately 1-2 times a week" |
| Kelley | loaded "plates, piles" and other equipment "as needed, approximately 1-2 times a week" and scraps "as needed" |
| Ashton McCasland | loaded screwpiles "as needed" and "assisted truck drivers strap material after loading daily.  He also loaded tools in the welding machines if they were needed for the job.  This was done approximately once a week" |
| Rosbel Olvera | loaded pipes "approximately 1-2 times a week" |
| Carlos Perez | loaded "screw pipes" "approximately once a week" |
| Alvin Perez-Lopez | loaded screwpiles and scrap pipes "approximately 2 times a week or as needed" |
| Sean Pohl | loaded equipment "approximately 1-2 times a week" and "strapped down equipment onto vehicles as needed, approximately 1-3 times a week" |
| Price | loaded pipes and other material "approximately 1-2 times a week" |
| Enrique Rodriguez | loaded scraps and pipes "approximately 2 times a week" and "strapped down equipment such as pipes and piles" "approximately 2 times a week" |
| Russell | loaded scrap metal and piles "approximately 1-2 times a week or as needed" |
| Daniel Scherr | loaded steel pipes "approximately 1-2 times a week" |

ROA.6009-6010.

Considering the above, the Claimants loaded regularly.  In other words, their loading was not "de minimis," but rather a "substantial part" of their activities.

Other Claimant evidence on this issue was not as favorable to Alpine.  *See* ROA.4815-4816; ROA.6009-6010.  But the district court was entitled to believe the testimony of Pemberton (ROA.4292-4293; ROA.4293) and Guillory (ROA.4495-4496; ROA.4496), discussed above, over such evidence, and obviously did.

Furthermore, this Court "evaluate[s] the work of the employees on a class-wide basis, even if, in doing so, the effect is to apply the MCA exemption to employees who rarely, or never, engage in interstate commerce." *Amaya v. Noypi Movers, L.L.C.*, 741 F.App'x 203, 206 (5th Cir. 2018).  And "when evaluating the nature of work from a class-wide perspective, we do not require a particularly high concentration of qualifying work in order to meet the MCA exception." *Id.*

Correspondingly, this Court has applied the MCA exemption when <u>four of the plaintiffs never traveled interstate</u> (*Songer v. Dillon Resources, Inc.*, 618 F.3d 467, 475 (5th Cir. 2010)), and the Supreme Court has applied it when <u>two of the plaintiffs never traveled interstate</u> (*Morris v. McComb*, 332 U.S. 422, 433 (1947)).

For this reason, too, the scant evidence favorable to the Claimants does not control.[4]

### 3.    The Claimants' cases are far afield.

The Claimants say *Hopkins v. Texas Mast Climbers, L.L.C.*, 2005 U.S. Dist. LEXIS 38721 (S.D. Tex. 2005), involved "similar facts."  Brief of Appellant at 24. The facts of *Hopkins* are not similar at all.

"Hopkins assisted in loading a truck" on only a "few occasions," during which "he placed equipment on the truck at the direction of the truck driver and exercised no discretion."  2005 U.S. Dist. LEXIS 38721, at *6.  Thus, "Hopkins's loading activities were a de minimis part of his job[.]"  *Id*. at *16.  "In addition, there is no evidence that any truck loaded by Hopkins traveled interstate."  *Id*. Unsurprisingly, the court ruled that the motor carrier exemption did not apply.  *Id*.[5]

The Claimants also point to a passage in *Hopkins* which states that "'loaders' are employees whose 'sole duties are to load and unload motor vehicles

---

[4]     In *Amaya*, this Court also wrote that it "look[s] to whether the employees could reasonably have been expected to engage in interstate commerce consistent with their job duties."  741 F.App'x at 206.  In that regard, Pemberton testified that Kelley, Chavez, Price, Angelo Molina, David Jackson, Singletary, Hamby, Holzbach, Rex Luman, Scherr, John Szatko, Russell, and Carlos Perez would have been called upon to load trailers.  ROA.4318-4320. Likewise, Belcher testified that Austin Braswell would have been reasonably likely to be called upon to load at the three jobsites at which Belcher supervised him; Carlos Perez would have been reasonably likely to be called upon to load at the two jobsites at which Belcher supervised him; and Leo Hernandez, Jr., Anthony Martin, Brady Paholek, and Russell would have been reasonably likely to be called upon to load at the jobsite at which Belcher supervised them. ROA.4751-4755.

[5]     The *Hopkins* court applied the since-invalidated standard that "exemptions are to be narrowly construed against the employer."  2005 U.S. Dist. LEXIS 38721, at *12.

and transfer freight between motor vehicles and between vehicles and the warehouse.'"  Brief of Appellant at 24 (quoting 2005 U.S. Dist. LEXIS 38721, at *13).  But there is no requirement that an employee who loads be a full-time loader in order to fall under the MCA exemption.  The Supreme Court has made that point very clear:

> The District Court, in applying § 204 of the Motor Carrier Act to respondents, will determine whether or not the activities of each respondent, *either as a whole or in substantial part*, come within the Commission's definition of the work of a "loader."  In determining whether the activities, *or any substantial part of the activities*, of an individual come within those of such a "loader," the District Court *shall not be concluded by the name which may have been given to his position or to the work that he does, nor shall the District Court be required to find that any specific part of his time in any given week must have been spent in those activities*.

*Ispass*, 330 U.S. at 707 (emphasis added).  Another court has, as well:

> A loader is an employee of a carrier—i.e. a person providing motor vehicle transportation for compensation or a person transporting property by motor vehicle, 49 U.S.C. §§ 13102(14), (15)—whose duties *include, among other things*, the proper loading of his employer's motor vehicles so they may be safely operated on highways.  29 C.F.R. § 782.5.  Thus, it has been determined that the safety of operation of motor vehicles on the highways is directly affected by the activities of these sorts of employees, *even if the duties of such employees include other duties that do not affect motor vehicles*.

*Moore v. Performance Pressure Pumping Servs., LLC*, 2017 U.S. Dist. LEXIS 63384, at *19 (W.D. Tex. 2017) (emphasis added).

The Claimants also point to *Mitchell v. Meco Steel Supply Co.*, 183 F. Supp. 777 (D. Tex. 1956) (Brief of Appellant at 25), but that case does not apply for the same reason *Hopkins* does not apply: the duties of the plaintiff only "from time to time" included "assisting with the loading and unloading of defendant's trucks," making his "connection with the loading, and the safety, of operation of such vehicles" merely "casual and inconsequential." *Id*. at 778-79. In other words, the plaintiff's loading in *Mitchell* was far different from the Claimants' loading here.

**C.    The District Court Applied The Correct "Loading" Standard.**

Citing page 3573 of the record, the Claimants assert the district court erred by stating a "could be called upon" standard for loading. Brief of Appellant at 15-18. They have misquoted the district court; on that page, the court stated a "likely to be called upon" standard. ROA.3573.

More importantly, on that page the court was quoting the "general rule" of 29 C.F.R. § 782.2(b)(3). The conclusion of law in which the district court provided the loading standard it was applying to the Claimants states:

> Plaintiffs, as part of their job duties, were expected to and did in fact load cutoff, excess cap plates, as well as other tools and equipment at the jobsite, onto flatbed trailers weighing more than 10,001 GVWR for transport back to the yards in Colorado and Texas.

ROA.3575.

The district court also made several findings of fact which manifestly applied the did-load standard:

- "Alpine's employees . . . load . . . items such as extra cap plates and other tools, equipment, and machinery onto trailers for transport to other jobsites or back to the yards in Colorado or Texas." ROA.3570.

- "Alpine's employees also load and secure load test equipment onto trailers for transport to other jobsites or back to the yards in Colorado or Texas." ROA.3571.

- "Plaintiffs worked for Alpine at its jobsites across the country, including in Louisiana, Mississippi, New Jersey, New Mexico, New York, Ohio, Oklahoma, Pennsylvania, Florida, and Wyoming. . . . Plaintiffs, as part of their job duties, were expected to and did in fact load cutoff, excess cap plates, as well as other tools and equipment at the jobsite, onto flatbed trailers weighing more than 10,001 GVWR for transport back to the yards in Colorado and Texas." ROA.3571.

- "The . . . 'cutoff' is . . . loaded . . . by Alpine's employees back onto the flatbed trailers to be transported back to the yards in Colorado or Texas." ROA.3570.

- "The screwpiles Alpine transports and installs are manufactured in yards located in Commerce City, Colorado, and Edna, Texas. Once manufactured, the screwpiles, along with other construction equipment and materials, are loaded onto 45-foot flat-deck trailers and transported by Alpine to Alpine's jobsites across the country." ROA.3570.

Citing six of this Court's opinions, the Claimants also say that "through recent decisions," the distinction between common carriers and private carriers "has become muddled," and the "failure" to match the type of carrier to the correct standard "has led to inconsistent, illogical and even absurd results with respect to the motor carrier exemption." Brief of Appellant at 18-20. They ask the Court to

"reverse with instruction to determine whether Kelley and the other plaintiffs were actually and regularly—as opposed to 'might be'—called upon to perform safety-affecting activities." Brief of Appellant at 20.

Any supposed conflict in the Court's case law is irrelevant; the district court found (ROA.3570; ROA.3571), and the evidence shows, that the Claimants regularly performed loading, in this case a safety-affecting activity. The evidence in this case met the highest standard, making the Claimants' argument at best academic. For the same reason, the Claimants' request is also academic; the district court already found that the Claimants did in fact load. ROA.3571.

Furthermore, under the "longstanding," "well-settled Fifth Circuit rule of orderliness," "one panel . . . may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our en banc court." *Jacobs v. Nat'l Drug Intelligence Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008). "Indeed, even if a panel's interpretation of the law appears flawed, the rule of orderliness prevents a subsequent panel from declaring it void." *Id*. And "to the extent there is conflict" between two opinions, "under [the] rule of orderliness, the earlier case controls"—not the "more recent." *GlobeRanger Corp. v. Software AG United States of Am., Inc.*, 836 F.3d 477, 497 (5th Cir. 2016).

Of the six cases the Claimants cite, *Songer*—the one they seek to avoid—is the earliest, except for *Barefoot v. Mid-America Dairymen, Inc.*, 1994 U.S. App.

LEXIS 43124 (5th Cir. 1994), which the Claimants suggest is aligned with, not contrary to, *Songer*. *See* Brief of Appellant at 19. So even if there was a conflict in this Court's jurisprudence, *Songer* would control.[6]

### D. Alpine Has Records Substantiating Its Defense, But Even If It Did Not, The Testimony In The Record Is Sufficient.

Citing page 3975 of the record, the Claimants say Alpine "admitted" it has no records showing they "performed work that directly affected the safe operation of commercial vehicles—and during which they arguably may have been exempt," which is "fatal to its defense." Brief of Appellant at 25-26. Again citing page 3975, they assert that Alpine "admitted" it has no records showing "which of its employees loaded which of its trailers or where they were going, whether interstate or intrastate." Brief of Appellant at 5.

On page 3975, Hawkins testified Alpine has "work reports that show [Kelley is] the one that's checked those off to say that he did those safety-affecting duties," but that the work reports do not specify where the load was going. ROA.3975. She then testified those loads "go to Commerce City and Edna, Texas." ROA.3975.

---

[6]     The Claimants take issue with *Songer* because the Court held the MCA exemption applied even though some of the employees "'did not drive any interstate routes.'" Brief of Appellant at 19 (quoting *Songer*, 618 F.3d at 476). Not only does *Songer* explain why that holding is correct, the Court went on to say that "the evidence further demonstrates that all the drivers--including the four Plaintiffs who did not drive any interstate routes--*could reasonably have been expected to drive in interstate commerce* consistent with their job duties." 618 F.3d at 475-76 (emphasis added).

There is no rule that an employer must keep records stating *which individual employees* loaded *which particular loads*, or conversely, that testimony of such loading is somehow insufficient.  In fact, in *Cunningham*, this Court rejected an argument similar to the Claimants':

> [Cunningham] contends the district court erred in granting summary judgment because there is no dispute that Cunningham's qualifications and hours of service were not actually regulated by the Secretary of Transportation, nor did Circle 8 maintain any records vis-à-vis Cunningham establishing compliance with the Motor Carrier Act.  According to Cunningham, this shows that the Secretary of Transportation did not have the power to establish his minimum qualifications and maximum hours of service.  This argument both misunderstands the law and misses the point.

> As noted above, the Secretary of Transportation need not actually exercise [its] power for the [MCA] exemption to apply.  Thus, the fact that Circle 8 has no records vis-à-vis Cunningham establishing compliance with the MCA or that Cunningham's qualifications and hours of service were not actually regulated by the Secretary of Transportation is of no moment.

64 F.4th at 601-02 (citation and quotation omitted).

The cases cited by the Claimants are not to the contrary.  In *L & F Distributors v. Cruz*, 941 S.W.2d 274, 283 (Tex. App.—Corpus Christi 1996, writ denied), the issue was not lack of records, but lack of any evidence at all:  "So long as the employee's work affects interstate transportation as defined above, the FLSA exception under section 213(b)(1) applies to loaders of freight because improperly loaded trucks are unsafe.  In this case, however, L & F presented no

evidence that it designated an interstate destination for any of the trucks loaded by

Cruz or any other L & F employee." (Citation omitted).

In *Olibas v. Barclay*, 838 F.3d 442 (5th Cir. 2016), this Court observed that

the employer failed to keep records of just about anything that was relevant:

- "Native could not produce drivers' logs, bills of lading, time sheets, or other documents conclusively showing interstate travel by the drivers." *Id*. at 446 (footnote omitted).

- "Native . . . also could not produce documentary evidence of any customer orders to support its intrastate theory." *Id*. (footnote omitted).

- "Native failed to maintain adequate payroll records, an obligation mandated by federal law." *Id*. at 447.

- "Native did not keep records or otherwise provide irrefutable evidence to challenge its drivers' testimony." *Id*. at 449.

- "Native could not produce documentation for a more accurate estimation of damages, nor could it produce records supporting an alternative damages model." *Id*. at 450.

The one record Native did produce was insufficient: "Native only produced

Interstate Fuel Tax Agreements ('IFTAs'). Although they reflected the out-of-state

miles recorded each year, the IFTAs only covered two years, showed no out-of-

state travel for long periods, did not identify drivers, and did not record the weights

of vehicles." 838 F.3d at 446 (footnote omitted). "Moreover, the jury saw a

discovery request for documents that 'ever informed any driver that he/she could

be indiscriminately assigned to drive an interstate trip' that Native responded to with 'none.'" *Id*.

Given the above, this Court observed four times that Native failed to keep or provide proper records.  838 F.3d at 449, 450, 451.  Even so, "It was a pure jury question whether to believe the employees or the employer. . . .  Even though it could have decided in favor of Native, the jury decided in favor of the drivers." *Id*. at 449.  The employee did not prevail just because Native lacked records.

Finally, in *Amaya*, the employer had documents; they were simply inadequate to carry its burden of proof:

> The record also includes certain work orders that required interstate deliveries listing Pioneer employees involved.  Notably, only two list the involvement of NOYPI Panel Techs, and they provide no information regarding the nature of their involvement. This is an insufficient basis to establish that Amaya and his class could reasonably have been expected to load trucks engaged in interstate commerce.

741 F.App'x at 206-07 (quotation omitted).

The rule the Claimants seek to impose does not exist.

### E.    Alpine Was Not Required To Establish That The MCA Exemption Applies On A Workweek Basis.

The Claimants contend the MCA exemption should be determined on a week-by-week basis here.  Brief of Appellant at 20-23.  They are incorrect.

### 1.    The "general rule" applies to this issue.

"As a general rule, if the bona fide duties of the job performed by the employee are in fact such that he is . . . called upon in the ordinary course of his work to perform, either regularly or from time to time, safety-affecting activities of the character described in paragraph (b)(2) of this section, he comes within the exemption in all workweeks when he is employed at such job."  29 C.F.R. § 782.2(b)(3).  As shown above, the Claimants were called upon in the ordinary course of their work to perform, and did perform, either regularly or from time to time, safety-affecting activities of the character described in paragraph (b)(2).[7]  As such, the Claimants "come[] within the exemption in all workweeks when [they were] employed at such job."

The "general rule assumes that the activities involved in the continuing duties of the job in all such workweeks will include activities which have been determined to affect directly the safety of operation of motor vehicles on the public highways in transportation in interstate commerce."  29 C.F.R. § 782.2(b)(3).  As also shown above, that is the case here.[8]  "Where this is the case, the rule applies

---

[7]    ROA.3983;  ROA.4014;  ROA.4026;  ROA.4153-4154;  ROA.4155;  ROA.4156; ROA.4185-4186;  ROA.4223-4224;  ROA.4293;  ROA.4383;  ROA.4400;  ROA.4589-4590; ROA.4600;  ROA.4624;  ROA.4627;  ROA.4815-4816;  ROA.4828-4829;  ROA.4841-4842; ROA.6009-6010.

[8]    ROA.3859-3861;  ROA.3869;  ROA.4007-4009;  ROA.4031-4032;  ROA.4193; ROA.4320-4321; ROA.4381; ROA.4406-4407; ROA.4516; ROA.4517; ROA.4575; ROA.4756; ROA.4835.

regardless of the proportion of the employee's time or of his activities which is actually devoted to such safety-affecting work in the particular workweek, and the exemption will be applicable even in a workweek when the employee happens to perform no work directly affecting 'safety of operation.'" *Id.*

Considering the above, Alpine was not required to establish that the MCA exemption applies on a workweek basis. A closely-related case supports this point.

The two plaintiffs in *Rosales v. Industrial Sales & Services, LLC*, 2022 U.S. Dist. LEXIS 179671 (S.D. Tex. 2022)—Leo Butler and Rosendo Rosales—are opt-in plaintiffs here. ROA.628; ROA.630. The defendant in *Rosales*—Industrial Sales & Services, LLC—is a sister company of Alpine. ROA.4803.

Butler and Rosales's counsel in *Rosales* represented the Claimants in the district court and do so here. ROA.3799. ISS's counsel in *Rosales* represented Alpine in the district court. ROA.3799.

In *Rosales*, Butler and Rosales argued that FLSA exemptions are determined on a workweek basis. 2022 U.S. Dist. LEXIS 179671, at *10. The district court firmly rejected their argument:

> The regulations implementing the MCA exemption provide that "if the bona fide duties of the job performed by the employee are in fact such that he is . . . called upon in the ordinary course of his work to perform, either regularly or from time to time, safety-affecting activities of the character described in paragraph (b)(2) of this section, he comes within the exemption in all workweeks when he is employed at such job." 29 C.F.R. § 782.2(b)(3). . . . Both Rosales and Butler testified that the continuing duties of their job include

47

loading and securing trailers. . . .   Rosales testified that these duties were something welders were expected to perform regularly in the ordinary course of their work, once or twice a week. . . . *Based on the Plaintiffs' continuing job duties, ISS does not need to establish each element of the MCA exemption on a week-by-week basis because "the rule [of 29 C.F.R. § 782.2(b)(3)] applies regardless of the proportion of the employee's time or of his activities which is actually devoted to such safety-affecting work in the particular workweek, and the exemption will be applicable even in a workweek when the employee happens to perform no work directly affecting "safety of operation."*

*Id.* at *11-13 (emphasis added).

The same reasoning applies here.  Alpine was not required to establish that the MCA exemption applies on a workweek basis.

### 2.   Regulatory guidance suggests any rule should be four months.

There is a second reason the Claimants' argument is incorrect.  This Court, "consistent with regulatory guidance, [has] never set a specific quantification of how frequently employees must engage in the sort of work that would qualify for the MCA exemption."  *Amaya*, 741 F.App'x at 206.

Such regulatory guidance suggests any rule should be four months.  In an opinion letter, the United States Department of Labor concluded that "DOT's jurisdiction . . . applies for a four-month period beginning on the date a driver could have been called upon to, or actually did, engage in interstate commerce," and that "DOT's jurisdiction ceases only if, at the end of the four-month period, the driver is no longer engaged in interstate commerce or, in the regular course of

his or her employment, is no longer subject to making such a trip." U.S. Dep't of Labor Op. Letter FLSA2006-3, at 2 (Jan. 13, 2006).[9]  Likewise, the Federal Highway Administration "believes that the 4-month period is reasonable because it avoids both the too strict week-by-week approach and the situation where a driver could be used or be subject to being used once and remain subject to jurisdiction under 49 U.S.C. 304 for an unlimited time." *Application of the Federal Motor Carrier Safety Regulations*, 46 Fed. Reg. 37902 (July 23, 1981).

As one court variously observed, "regulations of Department of Transportation" apply a four-month rule; "the DOT specifically rejected application of the 'week-by-week' . . . approach"; "numerous courts have applied the 4-month rule"; and "the week-by-week approach advocated by Plaintiff has been rejected by both the DOT and the courts." *Wells v. A.D. Transp. Express, Inc.*, 2016 U.S. Dist. LEXIS 75598, at **10, 11, 14 (E.D. Mich. 2016).  The MCA exemption should not be determined on a week-by-week basis.

## IV.    THE DISTRICT COURT DID NOT ERR IN DENYING THE CLAIMANTS' RULE 52(B) MOTION TO ADD OR AMEND FINDINGS OF FACT.

In a paragraph, the Claimants say that for "essentially the same reasons" discussed in their arguments on the merits, the district court abused its discretion by denying their rule 52(b) motion to add or amend findings of fact.  Brief of

---

[9]     Available at  https://www.dol.gov/agencies/whd/opinion-letters/search  (last visited February 1, 2024).

Appellant at 28. They present no independent reason that the district court's ruling on the motion was purportedly wrong. Brief of Appellant at 28. Because the Claimants' arguments on the merits are incorrect, the district court did not err by denying their rule 52(b) motion. *See Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1219 (5th Cir. 1986) ("[W]e cannot fault the District Court for denying" the rule 52(b) motion where "[e]ach of the parties was given full opportunity to submit to the trial court that evidence which it thought was relevant" and evidence supported trial court's findings of fact.).

## CONCLUSION

The district court called this case correctly. As such, Alpine respectfully asks the Court to affirm the judgment.

Respectfully submitted,

By:*/s/ Levon G. Hovnatanian*
Levon G. Hovnatanian
Texas Bar No. 10059825
*hovnatanian@mdjwlaw.com*
MARTIN, DISIERE, JEFFERSON & WISDOM, LLP
808 Travis Street, Suite 1100
Houston, Texas  77002
Telephone:  (713) 632-1700
Facsimile:  (713) 222-0101

Steven W. Watkins
Colorado Bar No. 51397
*steve@goldenlawyers.com*
BRADLEY DEVITT HASS & WATKINS, PC
2201 Ford Street
Golden, Colorado 80401
Telephone:  (303) 384-9228
Facsimile:  (303) 384-9231

**Counsel for Appellee Alpine Site Services, Incorporated**

## CERTIFICATE OF SERVICE

I certify that on February 1, 2024, I electronically transmitted this brief to the Clerk of the Court using the Court's ECF System.  I further certify that counsel of record for Appellants is being served with a copy of this brief by electronic means via the Court's ECF system, as follows:

> Curt C. Hesse
> *curt@mooreandassociates.net*
> Melissa Moore
> *melissa@mooreandassociates.net*
> MOORE & ASSOCIATES
> 440 Louisiana Street, Suite 1110
> Houston, Texas 77002-1055
>
> ***Counsel for Appellants***

> */s/ Levon G. Hovnatanian*
> Levon G. Hovnatanian

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 35(b)(2)(A) because it contains 10,662 words.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point font.

> */s/ Levon G. Hovnatanian*
> Levon G. Hovnatanian
> February 1, 2024